IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA ) 
) Criminal No. 11-00101
v. ) Judge Terrence F. McVerry
)
JOHN A. BROWNLEE, III )

## GOVERNMENT'S APPEAL FROM ORDER OF RELEASE

AND NOW, comes the United States of America by its attorneys, David J. Hickton, United States Attorney for the Western District of Pennsylvania, and Jessica Lieber Smolar, Assistant United States Attorney, and respectfully submits the following Appeal from Order of Release.

## I.   Introduction

Defendant John A. Brownlee, III has been indicted by a federal grand jury on a charge of Distribution of Material Depicting the Sexual Exploitation of a Minor in violation of Title 18, United States Code, Section 2252(a)(2).[1]

This case stems from a six-month long undercover operation, which took place from approximately November, 2010 through May 12, 2011, during which time Brownlee expressly detailed his sexual desire for very young children and took multiple steps to arrange to photograph and engage in sexual activity with a seven (7) year

---

[1] It is anticipated that the government will bring additional charges against Defendant based upon the information set forth herein in short order.

old child.  During consensually monitored telephone conversations, email messages and text messages with confidential sources, Brownlee further discussed his prior sexual encounters with his daughter from the time that she was three (3) years old through adulthood, his search for mothers or nannies in control of small children who would allow him "access" for the purposes of sexual activity with their children, and his communication with a father in Washington, D.C. with whom Brownlee hoped to meet so that he could watch his now-adult daughter have a sexual encounter with the father's two young boys.

Upon hearing small children in the background of a phone conversation with a person whom he met on an sadistic and masochistic website (hereinafter the "CHS"), Brownlee asked if those children could be made available to him for sex. The CHS declined and properly reported Brownlee's conduct to law enforcement. The CHS agreed to allow the FBI to record telephone, email and text message communications between the CHS and Brownlee.

On February 4, 2011, Brownlee sent multiple images of child pornography via the Internet to the CHS. Subsequent to his distribution of the child pornography, Brownlee then set into motion a plan to have sexual contact with a 7 year old child. On a recorded call on April 29, 2011 (played for the Court at the

detention hearing), Brownlee actually detailed for the CHS the graphic sexual acts that he would like to perform on the 7 year old child and possibly a three and a half (3 1/2) year old sibling.

The very next day, on April 30, 2011, Brownlee attended a meeting with undercover sources, one of whom he believed was the mother four young children.  The purpose of the April 30, 2011 meeting was to discuss Brownlee's desire to meet the following week at a hotel so that he could photograph and engage in sexual activity with the 7 year old child. Brownlee paid $100 each to the two confidential sources at the meeting on April 30, 2011 for "gas money" and agreed to pay an additional $200 at the hotel meeting for sex with the 7 year old child. Brownlee reserved a hotel room in his own name for May 12, 2011.

On May 12, 2011, Brownlee checked in to the hotel, paid cash for the room, and was arrested on the pending charges. A search warrant was executed for the car that Brownlee drove to the hotel and the search revealed such indicia, among other items, as a Barbie doll wrapped in pink paper, Viagra, a camera, $200 in cash, penis straws, a dildo, lubricant, sanitary napkins, tampons and condoms.

Because the Defendant, John A. Brownlee, III is clearly a danger to the community as a sexual predator with an active sexual

interest in very young children, the government requested that he be detained under the Bail Reform Act, 18 U.S.C. § 3142.  The government's Motion for Detention further specifically states that the defendant has been charged with a crime of violence as defined in 18 U.S.C. § 3156, and **"[t]hat a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the appearance of defendant as required and the safety of the community**, in that there is probable cause to believe that: Defendant committed an offense under 18 U.S.C. §§ .. 2252(a)(2)." (emphasis added).

On May 17, 2011, a detention hearing was held before the Honorable Ervin S. Swearingen, United States Magistrate Judge. After hearing testimony offered by the government, Magistrate Judge Swearingen ordered the Defendant released to home incarceration. Defendant did not offer a scintilla of evidence or testimony to rebut the statutory presumption. In his oral ruling, Judge Swearingen made no reference to the presumption in favor of detention, nor did he discuss how the presumption was rebutted by the Defendant.

Given the charge that has been filed against John A. Brownlee, III, pursuant to the PROTECT Act, a **presumption** exists pursuant to 18 U.S.C. § 3142(e), "that no condition or combination of

conditions will reasonably assure the appearance of the person as required and the safety of the community." The Defendant bears the burden to rebut that presumption, or he must be detained.

For the reasons herein stated, the Magistrate Judge's Order releasing Defendant Brownlee should be revoked and the government's motion for detention granted.

## II.  **Applicable Standard**

The Bail Reform Act of 1984 was enacted to permit district court judges to assess the potential dangerousness of the defendants appearing before them, and to detain such individuals as a means of protecting society from the threat posed by them. See United States v. Orta, 760 F.2d 887, 890 (8th Cir. 1985).

The governing statute is the Bail Reform Act, 18 U.S.C.A. §§ 3141-3156. "The statute's enactment reflects the deep public concern about the growing problem of crimes committed by persons on release and the recognition that 'there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons.'" United States v. Gatto, 727 F. Supp. 903, 910 (D. N.J. 1989) quoting United States v. Accetturo, 783 F.2d 382, 384 (3d Cir.1986) (quoting S.Rep. No. 225, 98th Cong.,

1st Sess. 6-7, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3188-89).

Under the Bail Reform Act, a court may consider the following in determining whether or not a defendant should be detained: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant including the defendant's character, physical and mental health, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history and record of appearing at court proceedings; (4) whether the defendant was on parole or probation or on release pending trial; and, (5) the danger to the community. 18 U.S.C. § 3142(g).

On April 30, 2003, the Bail Reform Act was amended to provide a presumption in favor of detention in most of the child sex offenses under federal law, offenses classified as crimes of violence under the Bail Reform Act. See 18 U.S.C. § 3156(a)(4)(C). The section of the PROTECT Act, which is entitled "No pretrial release for those who rape or kidnap children" provides, *inter alia*, that those like the Defendant who are charged with violating Title 18, United States Code, Section 2422 are presumed a danger to the community and should be detained. "Subject to rebuttal by the

6

person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as requires and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed .. An offense involving a minor victim under .. 2252(a)(2)."  18 U.S.C. § 3142(e).

This presumption is subject to rebuttal by the Defendant. United States v. Chagra, 850 F. Supp. 354, 357 (W.D. Pa. 1994).  It is the defendant's burden, in a case like this, to "com[e] forward with evidence he does not pose a danger to the community or to an individual." United States v. Abad, 350 F.3d 793, 797 (8th Cir. 2003).  See also Chagra, 850 F. Supp. at 357 (defendant may rebut the presumption by producing "some credible evidence that he will appear and will not pose a threat to the community.").

In Chagra, the district court found that a defendant charged with a drug offense must come forward with evidence, in order to rebut the presumption, "that he will not continue to engage in the drug activities with which he has been charged." Chagra 850 F.Supp. at 358.  By analogy, a defendant like John A. Brownlee, III, charged with using the computer to distribute child pornography, must come forward with affirmative evidence that he will not continue to distribute sexually explicit material involving

7

children or otherwise place children at risk.

It should be noted that "[o]nce the presumption has been rebutted, it does not disappear from the case. Rather, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." Chagra, 850 F.Supp. at 358.

When reviewing a bond decision, the District Court reviews the record de novo. United States v. Delker, 757 F.2d 1390, 1394 (3d Cir. 1985). When the government attempts to prove that a defendant should be detained because the defendant is a danger to the community, its burden of proof is "clear and convincing." 18 U.S.C. § 3142 (f)(2). The burden for risk of flight is a preponderance of the evidence. Abad, 350 F.3d at 796.

Congress recently revisited the issue of release for individuals charged with child exploitation crimes through the Adam Walsh Child Protection and Safety Act of 2006. Section 216 of the Adam Walsh Act, entitled "Improvements for the Bail Reform Act to Address Sex Crimes and other Matters," further amends 18 U.S.C. § 3142(e). 18 U.S.C. § 3142(c)(1)(B) now reads: "In any case that involves a minor victim under Section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, **2252(a)(2)**, 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or

2425 of this title, or a failure to register offense under Section 2250 of this title, any release shall contain, at a minimum, a condition of electronic monitoring and each of the conditions specified at subparagraphs (iv), (v), (vi), (vii), and (viii)." The effect of this provision is to mandate electronic monitoring as a **minimally** restrictive condition for an individual charged with 18 U.S.C. § 2252(a)(2), who has successfully rebutted the presumption that no conditions can be imposed that will protect the community.

In addition, the Adam Walsh Child Protection and Safety Act of 2006, expressly amended 18 U.S.C. § 3142(g) to read: "The judicial officer shall, in determining whether there are conditions or release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning – (1) the nature and circumstances of the offense charged, including whether the offense is a **crime of violence**, a Federal crime of terrorism, or **involves a minor victim** or a controlled substance, firearm, explosive, or destructive device."  By federal statute, 18 U.S.C. § 2252(a)(2) is both a crime of violence and an offense involving a minor victim.  18 U.S.C. § 3156(a)(4).

The Adam Walsh Act, HR 4472, Pub. L. No. 109-248, was signed by the President on July 27, 2006, and its provisions made

effective immediately as of July 27, 2006.

### III.   Statement of Facts

#### A.   The Indictment

On May 3, 2011, a federal grand jury indicted John A. Brownlee, III on one count of Distribution of Material Depicting the Sexual Exploitation of a Minor On or About February 4, 2011 pursuant to 18 U.S.C. § 2252(a)(2).

#### B.   The Detention Hearing

On May 17, 2011, before Magistrate Judge Swearingen, the government presented the testimony of two witnesses, FBI Special Agent Tanya Evanina and Pretrial Services Officer Eric Bossart. The Defendant offered no evidence and no testimony. The following is a summary of the testimony offered at the detention hearing, the transcript of which has been requested.

Agent Evanina described the investigation concerning Brownlee, which began in November, 2010, and testified that she had reviewed all of the consensually monitored email, telephone, and text message communications between Brownlee and the undercover sources during the course of the investigation. Agent Evanina testified that her review of the monitored telephone calls and email and text messages between the Brownlee and the CHS revealed that Brownlee had expressly stated his desire to have a sexual encounter with a

child. Agent Evanina also testified that she had reviewed the photographs sent by Brownlee on February 4, 2011 to the CHS and that they did contain child pornography images.

Agent Evanina testified that the investigation concerning Brownlee began when the a confidential human source (the "CHS"), while on a bondage and discipline/ sadism-masochism, (B&D/S&M) website, www.collarme.com, began conversing with another individual by posting messages back and forth (via the internet) on their profile pages. The person conversing with the CHS identified himself to the CHS as Jack Brownlee.

Agent Evanina testified, that after communicating with the CHS on the website for approximately two weeks, the CHS and Brownlee began to communicate via text messaging, as well as through verbal communications via cellular telephone. The CHS reported that during one of their conversations, she learned that Brownlee had a sexual interest in children and during another conversation, Brownlee overheard children talking and playing in the background of the CHS' conversation.  It was at that time that Brownlee learned that the CHS had small children.

 Agent Evanina testified that upon learning of the existence of the CHS' children, Brownlee informed the CHS that he has an ongoing sexual relationship with his now-adult daughter, and

admitted to having sexual contact with this daughter since she was three (3) years of age and to sexually penetrating her since she was twelve (12) years of age.  Brownlee also informed the CHS that he took and possessed pornographic photographs of this daughter when she was a child.

Agent Evanina testified that Brownlee asked the CHS if he/she was willing to provide his/her daughter or son to him for the purpose of a sexual encounter.  The CHS declined.  After declining his offer, Brownlee asked the CHS if he/she had access to any other children to whom he/she would allow him access for the purpose of having a sexual encounter. The CHS again declined.

Agent Evanina testified that on or about November 17, 2010, the CHS contacted law enforcement.  After making the initial complaint, the CHS cooperated with law enforcement and participated in numerous consensually monitored telephone calls with Brownlee. During the telephone calls, Brownlee expressly discussed his desire for children, as well as his past sexual experiences with children. Agent Evanina read some statements made by Brownlee during consensually monitored telephone calls between the CHS and Brownlee:

…" just spread eagle the little girl. Expose her around, hairless little slit. And just look at me and masturbate".
(December 22, 2010, 11:14 AM)

..."You turn her over.  Open her ass cheeks so you can see her asshole, enough to put your tongue in her ass. I like to put the tongue in her ass."
(December 22, 2010, 11:14 AM)

…"I need to find a mother that has a daughter, you know".
(February 3, 2011, 1:41 PM)

…"That's a young girl, not as young as I wanna be, but she's young.  She's like eighteen or whatever.  She's about ten years too old".
(February 3, 2011, 2:52 PM)

..." If you find someone that will let me take pictures, we can do that too. We don't have to actually do something with somebody, you know. We can start like and album, you know, to help recruit other situations in the future, you know"
(February 3, 2011, 2:52 PM)

..." In other words, you may be able to talk a mother into letting their kids be taking pictures at night when they are asleep versus doing something with them.  This is another set of circumstances.  I think it would be good to have a photo album of both don't you?"
(February 3, 2011, 2:52 PM)

Agent Evanina testified that on February, 4, 2011, Brownlee sent the CHS several photographs of child pornography.  The photographs were sent via the Internet through the message feature of the www.collarme.com website. Among the photographs sent via the

13

Internet by Brownlee was one of the photograph of a white female child, approximately 10-12 years of age, performing oral sex on an erect black male penis. Another photograph shows a prepubescent male, approximately 10-14 years of age, with an erect penis.  The male is bent over performing oral sex on himself.

Agent Evanina testified that during the correspondence between the CHS and Brownlee, the CHS introduced an undercover employee (hereinafter UCE #1) to Brownlee.  UCE #1 had the persona of a "black male dominate" with an interest in having a sexual relationship with a child.  This introduction was done at the request of Brownlee. Agent Evanina testified that UCE #1 and Brownlee communicated through email regarding their mutual interest in children.  During their communications, Brownlee discussed locating a mother to provide children for the purpose of having a sexual encounter and to produce child pornography. Agent Evanina testified to several statements made by Brownlee to UCE #1 by email which included the following:

> …"River mentioned that we have very similar interests which are considered by most to be taboo.(February 7, 2011, 3:14:53 PST)

> …" I try to find mom's into incest and have met a few that are.  I can remember one mom that wanted to watch fingering, tonguing, and cock tip touching (running up and down the smooth hairless slit) she encouraged and

masturbated while watching. She even comforted her daughter and spread open her 2 year olds legs for easier access". (February 22, 2011, 15:50:21 PST)

…"I have one that I have been working on for a year. She is a nanny and has access." (February 24, 2011, 11:24:47 PST)

Agent Evanina testified that through the email communications between Brownlee and UCE #1, a second, online undercover persona was created and introduced to Brownlee. The second, online undercover persona created was portrayed on-line as that of a female named Trina Ioob (hereinafter "UCE #2"). UCE #2 had the persona of a mother of four children who provided her children to UCE #1 in the past for a sexual encounter. Agent Evanina testified that UCE #2 and Brownlee discussed UCE #2 providing Brownlee access to her children for the purpose of having sexual contact. Agent Evanina read into the record one of the comments made by Brownlee in an email sent to UCE #2 as follows:

…"George and I have similar tastes, preteen hairless. That can be in the form of watching them together, you with them, or me with you and them, or me with you and photos or me with them" (March 10, 2011, 9:50:29 PST)

Agent Evanina testified that Brownlee advised the CHS that he was interested in meeting with the CHS and UCE #2 in person, and that he was available to meet on either April 29, 2011 or April 30,

2011.  The purpose of the "in person" meeting was to gain the trust of each other and to discuss the details of Brownlee meeting the seven (7) year old daughter of UCE #2 for the purpose of having a sexual encounter.

Agent Evanina testified that on April 29, 2011, the CHS participated in a consensually recorded telephone conversation with Brownlee in which they discussed the aforementioned meeting.  For purposes of the detention hearing, Agent Evanina excerpted portions of the April 29, 2011 call and played the recording for the Court at the hearing. A true and correct copy of the taped excerpts was provided to opposing counsel and the Court.  Some of the statements made by Brownlee on this recording were as follows:

> ... "Well, um, I guess that will be the hard decision as to whether to, uh, do this three and a half or the seven you know?"
>
> ...Well try to uh, whether it's the three and a half year old or the seven, I'll be fingering her and I'll be using my tongue on her you know? That much for sure. Um, uh, maybe, uh, maybe make them, if they're awake, maybe make them, uh walk around, you know, model a little bit. I don't know. Uh, I like to, if it's the seven year old, I'd like her to be wearing like a Catholic school outfit with real short skirts, you know?
>
> ...That kind of stuff, you know? And lift her skirt and like white underwear that I can move to the side that kind of stuff so...you know definitely sit her on my lap and, you know, if she's really scared and stuff, maybe give her a back rub, you know. Something to calm her down, you know, I don't know what to expect. I don't know

16

what experience they've had. I just know what I've done with Mia and so forth when she was younger.

...expose myself so they can see me. And, uh, you know if I, uh, can't fuck 'em...at least run my cock up and down their slits....If I can't fuck 'em at least run my cock up and down their slits, you know?

...And, uh, you know maybe have them stroke me. So, who knows, you know...what I can get away with. I don't know. I'd like to penetrate them obviously...And the question is, is she going to let me put my load into them, or do I have to pull out or what, you know?

Agent Evanina testified that on April 30, 2011, Brownlee met with the CHS and UCE #2, at an Eat-n-Park restaurant on Lincoln Highway, North Versailles, Pennsylvania.  The meeting was recorded by the FBI.  For the "in-person meeting", an FBI undercover employee portrayed UCE #2.  Agent Evanina testified that the function of the face-to-face meeting was to discuss the details of UCE #2 sharing her children with Brownlee for the purpose of having a sexual encounter and producing child pornography.

Agent Evanina testified that during the meeting, UCE #2, Brownlee, and the CHS scheduled a date for Brownlee to meet the 7-year-old daughter of UCE #2 for the purpose of a sexual encounter. They scheduled the meeting for the week of May 8, 2011. Brownlee and UCE #2 agreed that Brownlee would book and finance the hotel room to be utilized for the sexual encounter and to pay UCE #2 $200.00 for allowing him access to her 7 year old daughter.

Moreover, it was agreed that Brownlee would bring a Barbie doll for UCE #2's daughter, as well as a camera to be utilized to photograph Brownlee and the child. Agent Evanina testified that Brownlee and the UCE #2 also discussed which sex acts Brownlee could perform on the child. Brownlee gave unsolicited $200 cash ($100 each) to the CHS and UCE #2 as "gas money" for their coming to the April 30, 2011 meeting with him.

Agent Evanina testified that Brownlee reserved a room in his name at the Knights Inn, Hickory Grade Road, Bridgeville, Pennsylvania, with an arrival date of May 12, 2011.

Agent Evanina testified that on May 12, 2011, at approximately 12:08 PM, Brownlee drove into the parking lot of the hotel, exited the vehicle and proceeded to check in to the motel by paying in cash.  He then drove to the parking area outside the designated motel room, exited his vehicle, and was placed under arrest by agents of the FBI. Agent Evanina testified that a search warrant was executed for Brownlee's car and the search revealed, among other things, a Barbie doll wrapped in pink paper, Viagra, a camera, $200 in cash, penis straws, a dildo, lubricant, sanitary napkins, tampons and condoms.

Agent Evanina testified that Brownlee told her upon his arrest that he rarely spends nights in his North Versailles home, instead

sleeping at one of his two jobs. He told Agent Evanina that he essentially lives out of his car. He stated that he only sleeps at his home one or two nights a week. He does not have a land line telephone at his residence. She testified that Brownlee is separated from his wife.

Pretrial Services Officer Eric Bossart testified and affirmed that facts relating to the offense and evidence provided at the detention hearing beyond the Indictment were not considered in Pretrial Services' release recommendation. Mr. Bossert testified that Pretrial Services was not made aware that there was no land line telephone in Brownlee's home or that he only spent one to two nights a week at that house. He testified that, given those facts, he did not believe Brownlee was a workable candidate for electronic monitoring. Bossert also testified concerning electronic monitoring generally. He described a system which would register an alert with an alarm company, which would then notify the Pretrial Officer. The Officer would then act upon the alert after further investigation and inquiry. He estimated a time frame of approximately 15 minutes before action might be taken on an alert.

The Pretrial Services Report did not address the presumption of detention applicable in this case.

IV.   **Argument**

A.   **Defendant is a Significant Danger to the Community**

Defendant, whose sexual fixation on young children is amply documented through months of emails, text messages and recorded telephone calls, poses a significant danger to the community. The Magistrate Judge erred in finding that this Defendant, who has claimed to have engaged in sexual activity with his daughter and admitted to actively searching for mothers and nannies through which to gain "access" to other young children for sexual activity, be released to his home.  He should be detained pending trial.

1.   **Dangerousness as a factor under the Bail Reform Act**

The passage of the Bail Reform Act of 1984 marked a departure from previous bail laws because Congress provided for pretrial detention of a defendant, regardless of whether that defendant poses a risk of flight, if the court determines that "no condition or combination of conditions will reasonably assure...the safety of any other person and the community." 18 U.S.C. § 3142(e).  In this case, Congress has determined that it should be presumed that the Defendant is a danger to the Community.

Indeed, the legislative history of the PROTECT Act indicates that Congress intended that Defendants like James Smith be

detained.   According to the Statement of Chairman Lamar Smith,
commenting on H.R. 5422:

> For those individuals that would harm a child,
> we must ensure that punishment is severe and
> that sexual predators are not allowed to slip
> through the cracks of the system to harm other
> children.   To this end, this legislation
> provides a 20-year mandatory minimum sentence
> of imprisonment for non-familial abductions of
> a child under the age of 18, lifetime
> supervision for sex offenders and mandatory
> life imprisonment for second time offenders.
> **Furthermore, H.R. 5422 removes any statute of
> limitations and opportunity for pretrial
> release for** crimes of child abduction **and sex
> offenses**.

Smith comments, H.R. 5422; see also House Report, 107-723, Part I,
Child Abduction Prevention Act, Title IV (emphasis added).

Chairman Smith also noted that "[s]ex offenders and child
molesters are four times more likely than other violent criminals
to recommit their crimes.   This number demands attention,
especially in light of the fact that a single child molester, on
average, destroys the lives of over one hundred children." Id.

The presumption in favor of detention was an important part of
the Protect Act, given the extraordinarily high numbers of child
victims that may be attributed to a single offender.[2]

_____

[2] A study conducted on sex offenders at FCI Butner concluded
that 85 percent of the child pornographers or travelers who
participated in the study admitted to having committed contact
sex crimes which went undetected by the criminal justice system.

The previous Bail Reform Act itself "was a legislative response to growing public concern over increased crime and the perceived connection between crime and defendants released on bail." <u>United States v. Orta</u>, 760 F.2d 887, 890 (8th Cir. 1985). It "reflect[ed] the Committee's determination that Federal bail laws must address the alarming problem of crimes committed by persons on release and must give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. The adoption of these changes marks a significant departure from the basic philosophy of the [prior bail act], which is that the sole purpose of bail laws must be to assure the appearance of the defendant at judicial proceedings." <u>Id</u>. citing S. Rep. No. 225, 98th Cong., 1st Sess. 3, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3185-3186.

   2.   <u>**Defendant is a Danger to the Community**</u>

"The legislative history [of the Bail Reform Act] specifies

---

These types of offenders "had an average of **30.5 child sex victims each.** In fact, this group of [90] offenders admitted [after being polygraphed] to having molested a combined total of 1,433 victims without ever having been detected." <u>See</u> Statement of Andrea E. Hernandez, Director of the Sex Offender Treatment Program Federal Correctional Institution, Butner, NC, before the U.S. House of Representatives, September 26, 2006.

that the concept of a defendant's dangerousness as used in the act is to 'be given a broader construction than merely danger of harm involving physical violence.'" <u>United States v. Delker</u>, 757 F.2d at 1393.

Defendant is charged with a crime of violence involving a minor victim--distribution of child pornography--which is one important factor to consider in determining his dangerousness to the community. Defendant faces a mandatory minimum 5 years in prison. However, equally probative of his dangerousness to the community is the fact that he has a documented sexual interest in very young children and was actively searching for "access" to young children on the Internet when he encountered the CHS who reported his requests to law enforcement.

Further, Brownlee expressly told the CHS that he sexually abused his daughter from the time that she was three years old. Thus, by his own admissions, his sexual fixation is not merely on children in general, but with those to whom he has a very specific familial or custodial relationship. This makes Brownlee especially dangerous. Very young children are the least likely to disclose abuse and seek help, and are most likely to be trusting and vulnerable to advances by an adult.

### 3.    Electronic monitoring does not solve the dangerousness problem here

Home incarceration with electronic monitoring will not assure the safety of the community and of children in the community. Indeed, by his own admission, Brownlee spends minimal time in his home, sleeps at work, lives out of his car, has no telephone in the home, and is separated from his wife.

Moreover, there is absolutely nothing to stop someone from bringing a child into Brownlee's home.  Electronic monitoring, in this District, is not designed for rapid response to a violation. It does not function like an electronic dog fence, where there is an immediate negative response to any breach of the perimeter.  The electronic monitoring may offer feedback to the defendant's location, but provides no insight into his activities, the presence of children, and cannot offer an immediate response to a violation. Importantly, it should be noted that electronic monitoring does not prevent a person from having visitors to his home.  It only monitors whether the person leaves the home, or removes the bracelet.  Electronic monitoring simply cannot adequately eliminate the risk of danger to a child in this case.

In addition, to the extent that the Court believes that a hearing on the detention issue is necessary, the government is

prepared to introduce additional evidence concerning a recent search executed pursuant to a warrant at Brownlee's home. Specifically, the government's evidence will support the fact that Brownlee does not appear to actually reside in this home. The evidence will show that the home was in significant disarray, except for one room near the attic with a lock on the door that contained such items as an air mattress, dildos, restraints, handcuffs and ankle cuffs, an eye mask, ping pong paddles, a baseball bat, and large lighting bulbs.  Also located within the home were two firearms. Moreover, additional testimony at a hearing will reveal that Brownlee had suggested via a text message to the CHS, on May 4, 2011, that the meeting with the 7 year old would be "much more private" at his home since there are no security cameras there.

Home detention in this home simply is not an option to protect the community at large and children specifically from the serious danger posed by Brownlee.

### 4.  The Magistrate Judge erred in failing to consider the statutory presumption

The Magistrate Judge failed to consider the statutory presumption in favor of detention or give it any weight in his decision.  Where, as here, the Defendant did not put on <u>any</u>

evidence or testimony to rebut the presumption, the Magistrate Judge committed clear error.

In resolving the issue of detention, the district court is required to consider several factors under § 3142(g), in addition to the statutory presumption, including: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, and criminal history; and (4) the nature and seriousness of the danger that the defendant's release poses to any person or the community. 18 U.S.C. § 3142(g); Delker, 757 F.2d at 1398-99.[3]

Without question, factors 1, 2 and 4 (the nature and circumstances of the offense charged; the weight of the evidence against the defendant; and the nature and seriousness of the danger that the defendant's release poses to any person or the community) weigh in favor of the government in this case.

---

[3] One additional factor, whether the defendant was on parole or probation or on release pending trial, is not applicable here, as Brownlee has no known criminal history.

Even if this Court concludes that factor 3 weighs in favor of the Defendant despite the utter lack of evidence presented to the Magistrate Judge on this point, all the other factors, including the statutory presumption, weigh heavily in favor of detention. The record establishes that (1) the nature and circumstances of the offense are particularly egregious; (2) the weight of the evidence is strong against the defendant, especially in light of his recorded statements; (3) his persistent interest in children, make him a high risk of continued criminal conduct -- in a group that itself poses a very high risk of recidivism.

Simply stated, the § 3142(g) factors, coupled with the statutory presumption in favor of detention that has not been rebutted, plainly weigh in favor of detention in this case.

## V.   Conclusion

Defendant John A. Brownlee, III, stands charged with distribution of child pornography, an offense criminalized by Congress because child sex offenders pose an inherent threat to society's safety.  Based on the evidence presented herein, it is clear that Defendant poses a significant danger to the community because he not only possesses the clear and express desire to have sexual contact with extremely young children, but has demonstrated his willingness to take very real action toward his desire. There

27

is a statutory presumption that Brownlee should be detained, and that presumption has not been rebutted. The Magistrate Judge's Order of Release should be vacated and Defendant should be detained.

Respectfully submitted,

JESSICA LIEBER SMOLAR
United States Attorney

s/ Jessica Lieber Smolar
By:  JESSICA LIEBER SMOLAR
Assistant U.S. Attorney
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 644-3500 (Phone)
PA ID No. 65406